825 F.2d 1430
 56 USLW 2092
 WESTERN NUCLEAR, INC., Energy Fuels Nuclear, Inc.; Uranium
Resources, Inc., Plaintiffs-Appellees,
v.
F. Clark HUFFMAN, as Chief Enrichment Services Branch,
Enriching Operations Division, Department of Energy; Sherry
E. Peske, as Acting Director of Marketing and Business
Operations (Uranium Enrichment) of the Department of Energy;
John R. Logenecker, as Deputy Assistant Secretary of
Uranium Enrichment of the Department of Energy; William R.
Voigt, as Special Assistant for Strategic Policy Assessment
to the Assistant Secretary for Nuclear Energy of the
Department of Energy; James W. Vaughn, as Assistant
Secretary for Nuclear Energy of the Department of Energy;
Earl Ghelde, as Special Assistant to the Secretary of the
Department of Energy; Daniel Boggs, as Under Secretary of
the Department of Energy; Donald P. Hodel, as Secretary of
the Department of Energy; United States Department of
Energy, Defendants-Appellants,
City of San Antonio, Acting By and Through the City Public
Service Board of San Antonio, Duke Power Company; Gulf
States Utilities Company; Houston Lighting & Power Company;
Kansas City Power & Light Company; Kansas Electric
Cooperatives, Inc.; Kansas Gas & Electric Company; New
York Power Authority; Ohio Edison Company; Pennsylvania
Power & Light Company; Philadelphia Electric Company;
Public Service Company of Colorado; Public Service Electric
& Gas Company; Southern California Edison Company;
Southern Company Services, Inc.; the Connecticut Light and
Power Company; the Toledo Edison Company; Virginia
Electric and Power Company; Western Massachusetts Electric
Company; Wisconsin Electric Power Company; Union Electric
Company; Baltimore Gas and Electric Company; Arkansas
Power & Light Company; Middle South Energy, Inc.; Middle
South Services, Inc.; and Louisiana Power & Light, Amici Curiae,
National Taxpayers Union, Amicus Curiae,
States of Wyoming, New Mexico, Colorado, Utah and Nevada,
Amici Curiae.
 Nos. 85-2428, 86-1942.
 United States Court of Appeals,
Tenth Circuit.
 July 20, 1987.
 
 Marc Johnston, Atty., Civil Div., Dept. of Justice, Washington, D.C. (Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Robert N. Miller, U.S. Atty., D. Colo., and Leonard Schaitman, Atty., Civil Div., Dept. of Justice, J. Michael Farrell, General Counsel, and I. Avrum Fingeret, Deputy Asst. General Counsel, Dept. of Energy, of counsel [No. 86-1942 only], with him, on the briefs), for defendants-appellants.
 Peter J. Nickles of Covington & Burling, Washington, D.C. (John H. Schafer [No. 85-2428 only], and Paul G. Gaston of Covington & Burling, Washington, D.C., and Harley W. Shaver and Bruce Dewald of Shaver & Licht, Denver, Colo., with him, on the briefs), for plaintiffs-appellees.
 Harry H. Voigt, Mindy A. Buren, and C. Christopher Sprague of LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., on the briefs, for amici curiae City of San Antonio, et al.
 B. Jeanine Hull of Kirkpatrick & Lockhart, Washington, D.C., and William A. Strauss and William T. Lane of Nat. Taxpayers Union, Washington, D.C., of counsel, on the brief, for amicus curiae Nat. Taxpayers Union.
 A.G. McClintock, Wyoming Atty. Gen., Steven R. Shanahan, Sr. Asst. Atty. Gen., Paul Bardacke, New Mexico Atty. Gen., Duane Woodard, Colorado Atty. Gen., Brian McKay, Nevada Atty. Gen., and David L. Wilkinson, Utah Atty. Gen., on the brief, for amici curiae States of Wyo., N.M., Colo., Nev. and Utah.
 Before McKAY, McWILLIAMS and BALDOCK, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 Plaintiffs, three uranium mining and milling companies, filed a five-count complaint challenging various Department of Energy (DOE) policies. Shortly after filing the complaint, plaintiffs moved for summary judgment on count two, which challenged the DOE's use of the recently adopted uranium enrichment services contract (UESC). The district court granted plaintiffs' motion, and the DOE appealed. While that appeal was pending, the district court also granted plaintiffs' summary judgment motion on count one, which alleged that the DOE was statutorily required to restrict enrichment of foreign uranium. The DOE appealed that decision, and we consolidated the two appeals.
 
 
 2
 This case raises important issues, the resolution of which will affect not only the parties involved in this suit but also all utilities that use nuclear power as well as the eventual consumers who purchase power from such utilities. A brief exposition of the nuclear industry and its history is helpful in understanding these important issues and their ramifications.
 
 I. Background
 
 3
 Private-entity involvement in the nuclear industry evolved gradually. In its infancy, the Government had a complete monopoly over the nuclear industry. It owned all uranium, all nuclear fuel, and all nuclear production and utilization facilities. Initially, the Atomic Energy Commission (AEC), the DOE's predecessor, controlled these operations. The AEC did permit private entities to mine uranium ore, but these entities could only sell to the Government. In 1954, Congress enacted legislation that permitted private ownership of nuclear reactors as well as private possession and use, but not ownership, of nuclear fuel. The AEC issued licenses permitting use of nuclear fuel and monitored entities that owned reactors and used nuclear fuel. However, private entities that mined uranium ore continued to have only one customer--the Federal Government. Finally, in 1964, Congress passed legislation permitting private ownership of nuclear fuel and allowing uranium mining and milling companies to sell to private entities.
 
 
 4
 Notwithstanding this shift to the private sector, the Government continued to play an important role in the nuclear fuel cycle. The natural uranium mined could not be used directly as nuclear fuel by the private entities that bought it. Natural uranium consists of less than one percent U-235, and nuclear fuel must contain approximately three percent U-235. Thus, to be used as nuclear fuel, uranium must have a higher concentration of U-235 than is found in nature. The process that produces this high concentration is called "enrichment," and, in 1964, the AEC was the only entity in the world with enrichment facilities. Consequently, private entities could not use natural uranium unless the AEC first enriched it to the level required for use as nuclear fuel. Congress recognized this and, when it privatized the ownership of nuclear fuel, permitted the AEC to contract with private entities for the provision of enrichment services. In order to protect the economic strength of the domestic uranium industry, Congress also restricted enrichment of foreign uranium when the resulting nuclear fuel was designated for use in domestic facilities. Initially, the AEC was not permitted to enrich any foreign uranium for domestic use. As demand for nuclear fuel increased, however, the restrictions were phased out, and the AEC, later the DOE, eventually provided enrichment services for both domestic and foreign uranium.
 
 
 5
 Increases in demand for nuclear fuel also encouraged foreign entities to build enrichment facilities. This increased the competition for enrichment and permitted some of the DOE's domestic and foreign customers to obtain enrichment services outside the United States. As long as demand for nuclear fuel continued to increase, neither the DOE nor the domestic mining and milling companies were overly concerned with foreign competition. Rather, they were operating at capacity and were not threatened by the foreign competition.
 
 
 6
 The boom, however, was followed by a bust. Private entities that expected uranium demand to exceed supply had entered long-term contracts for uranium and for enrichment services. The quantities were based on forecasts of nuclear fuel needs in all present and future facilities. Unfortunately, many nuclear facilities were not completed on schedule, or were never completed, and private entities were left with huge stockpiles of nuclear fuel and no place to use it. Some sold nuclear fuel to other entities and, as their contracts expired, stopped purchasing both uranium and nuclear fuel. Others, however, began to purchase higher quality uranium at lower costs from now fully operational foreign mines.
 
 
 7
 The DOE also faced increased foreign competition in the enrichment field. It responded by offering enrichment services on new and different terms. Restrictions on enrichment of foreign uranium had long since been discontinued, but the DOE now offered a variable-tails option in order to attract customers away from the foreign competition. Tails are the depleted uranium left over after the enrichment process is completed. A DOE customer could select a low tails assay--a low concentration of U-235 in the tails--and decrease the uranium required in the enrichment process. In other words, by increasing the enrichment used on a particular quantity of uranium, the DOE was able to increase the amount of enriched uranium produced from a given quantity of natural uranium. By offering the variable-tails option, the DOE permitted its customers to use more uranium and less enrichment services or less uranium and more enrichment services.
 
 
 8
 These DOE policies with respect to enriching foreign uranium and offering a variable-tails option increased the perceived economic threat to domestic uranium mining and milling companies. They faced increased use of foreign uranium as well as decreased use of uranium in general because of the new variable-tails option. Plaintiffs and other mining and milling companies responded by requesting that the DOE implement restrictions on enrichment of foreign uranium as required by 42 U.S.C. Sec. 2201(v) (1982), which provides that the DOE, "to the extent necessary to assure the maintenance of a viable domestic uranium industry shall not offer [enrichment] services for source or special nuclear materials of foreign origin intended for use in a utilization facility within or under the jurisdiction of the United States." The DOE initially refused, claiming that the domestic mining and milling industry was viable, and, thus, section 2201(v) did not require any restrictions. In 1984 and again in 1985, however, the DOE expressly found that the domestic uranium industry was not viable. Even so, it still refused to impose restrictions, now claiming that even if restrictions were imposed the domestic industry would not become viable.
 
 
 9
 Meanwhile, the DOE was grappling with economic problems of its own. It had become the high cost provider of enrichment services and had lost many of its customers to foreign enrichers. In an attempt to recapture part of the market, the DOE adopted the UESC. This standard form contract provided lower prices, encouraged use of foreign source uranium, and permitted a variable-tails option. Prior to using the UESC, the DOE did not implement any rulemaking procedures pursuant to the Administrative Procedure Act or submit the contract to Congress.
 
 
 10
 Plaintiffs, already threatened by the precarious economic state of the uranium industry, felt further threatened by the UESC and thereafter filed their complaint in this matter.
 
 
 11
 II. Challenge to Uranium Enrichment Services Contract
 
 
 12
 In count two of their complaint, plaintiffs challenged the DOE's adoption of the UESC. The claim was based on both substantive and procedural grounds, but the district court reached only the latter in concluding that the adoption of the UESC was procedurally defective. It stated:
 
 
 13
 I conclude that the new [UESC] amounts to a change in the "criteria" under which enrichment services are to be performed. Because the contract was not submitted to Congress, it is null and void.
 
 
 14
 Accordingly, it is ordered that the plaintiffs motion for partial summary judgment as to Count II is granted.
 
 
 15
 Amended Order, record, vol. 2, doc. 15, at 4.
 
 
 16
 The DOE now challenges the decision on count two, claiming that: (1) plaintiffs' claim is moot; (2) plaintiffs lack standing; and (3) the district court was erroneous on the merits.
 
 A. Mootness
 
 17
 Mootness goes to the jurisdiction of a federal court. To satisfy the "case or controversy" limitation of Article III, "[t]he actual controversy between the parties 'must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated.' " Wiley, 612 F.2d at 475 (quoting Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973)). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). "The burden of demonstrating mootness 'is a heavy one,' " County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632-33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)), and can be satisfied only if two conditions are shown:
 
 
 18
 (1) it can be said with assurance that "there is no reasonable expectation ..." that the alleged violation will recur, see [U.S. v. W.T. Grant, 345 U.S. 629] at 633 [73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ]; see also SEC v. Medical Committee For Human Rights, 404 U.S. 403 [92 S.Ct. 577, 30 L.Ed.2d 560] (1972), and
 
 
 19
 (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See, e.g., DeFunis v. Odegaard, 416 U.S. 312 [94 S.Ct. 1704, 40 L.Ed.2d 164] (1974); Indiana Employment Security Div. v. Burney, 409 U.S. 540 [93 S.Ct. 883, 35 L.Ed.2d 62] (1973).
 
 
 20
 Davis, 440 U.S. at 631, 99 S.Ct. at 1383.
 
 
 21
 We need only reach the second condition. The DOE asserts that plaintiffs' sole challenge to the UESC was that its implementation was procedurally defective. Indeed, the grounds for the district court's granting of plaintiffs' summary judgment motion was that "the [UESC] amounts to a change in the 'criteria' under which enrichment services are to be performed [and it] was not submitted to Congress." Western Nuclear, Inc. v. Huffman, No. 84-C-2315, slip op. at 4 (D.Colo. Sept. 19, 1985). Since the district court's decision in this case, the DOE has submitted the UESC to rulemaking procedures. DOE, therefore, argues that plaintiffs' appeal is moot.
 
 
 22
 We need not determine whether subsequent DOE and congressional activity cured any alleged procedural defects in this case and thus mooted plaintiffs' claim. Their challenge was not based only on procedural grounds; it included substantive grounds as well, and plaintiffs' substantive challenge to the UESC remains viable. The DOE admits that the criteria adopted through the subsequent rulemaking procedures are the same as those embodied in the UESC. Consequently, if substantive deficiencies existed before the DOE rulemaking process, they still exist.
 
 
 23
 Because we conclude that the DOE has not shown that plaintiffs' claim has been eradicated by subsequent rulemaking, we need not reach the issue of whether the violations can recur. The DOE has failed to show that plaintiffs' claim is moot.
 
 B. Standing
 
 24
 Even though the DOE did not challenge plaintiffs' standing in the district court, we must address that issue before we can reach the merits of this case.
 
 
 25
 Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto. See, e.g., Marbury v. Madison, 1 Cranch (5 U.S.) 137, 173-180, 2 L.Ed. 60 (1803). For that reason, every federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review," even though the parties are prepared to concede it. Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934).
 
 
 26
 Bender v. Williamsport Area School Dist., 475 U.S. 534, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). One jurisdictional requirement is that of standing.
 
 
 27
 Standing focuses on whether a particular plaintiff has the right to pursue a cause of action. "[L]ike mootness and ripeness, [it] 'has its constitutional origins in the "case or controversy" limitation of Article III which insures that courts exercise their power only in cases where true adversary context allows informed judicial resolution.' " Citizens Concerned for Separation of Church & State v. City of Denver, 628 F.2d 1289, 1294 (10th Cir.1980) (quoting Wiley v. National Collegiate Athletic Ass'n, 612 F.2d 473, 475 (10th Cir.1979), cert. denied, 446 U.S. 943, 100 S.Ct. 2168, 64 L.Ed.2d 798 (1980)), cert. denied, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). While the courts have not always been clear as to which standing requirements are based on the Constitution and which are based on prudential concerns of the courts, they have established that
 
 
 28
 at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450] (1976).
 
 
 29
 Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Consequently, to establish standing, plaintiffs must show[1] that the DOE's adoption of the UESC has injured them and that the court can redress that injury by invalidating the UESC.
 
 
 30
 Plaintiffs claim they have met this burden because the DOE, by filing its cross-motion for summary judgment without challenging standing, implicitly acknowledged plaintiffs' standing. However, "[p]arties may not by stipulation invoke judicial power of the United States in litigation which does not present an actual case or controversy, and jurisdictional questions are of primary consideration and can be raised at any time by courts on their own motion." City of Denver, 628 F.2d at 1296-97 (citations omitted). Thus, the DOE cannot consent to plaintiffs' standing. In fact, even if no party challenged standing, we are required to raise the issue.
 
 
 31
 At the summary judgment stage, plaintiffs are entitled to prevail only if the record shows "that there is no genuine issue as to any material fact and that [plaintiffs are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When the standing issue is not raised in the district court, review on appeal may reveal factual disputes. See, e.g., Steele v. National Firearms Act Branch, 755 F.2d 1410, 1414 (11th Cir.1985).
 
 
 32
 The factual dispute with respect to standing in this case revolves around the causation element of standing. The parties agree that plaintiffs have been harmed by the decline in demand for domestic uranium; however, they disagree on whether the adoption of the UESC has any nexus to that decline. An affidavit filed by plaintiffs in support of their motion for summary judgment states in relevant part:
 
 
 33
 DOE policies with respect to the provision of enrichment services can have and do have a significant impact on demand for uranium and, consequently, the viability of the domestic uranium industry. For example, independent consultants (e.g., Nuexco and Nuclear Resources International) indicate that DOE's new [UESC] may diminish demand for uranium by as much as 100,000,000 pounds or more over the next five to ten years. This approximates or exceeds expected production for the period.
 
 
 34
 Plaintiff's Memorandum in Support of Motion for Summary Judgment on Count II, record, vol. 1, doc. 3, Exhibit B (affidavit of Larry A. Boggs), at p 2. To support the causal link, and thus standing, between the adoption of the UESC and the decrease in demand for domestic uranium, plaintiffs argue on appeal that the UESC: (1) fails to restrict enrichment of foreign uranium; (2) permits enrichment customers to select a variable-tail assay that increases the use of enrichment services and decreases the use of uranium; and (3) contains pricing provisions that decrease demand for domestic uranium. If the UESC is invalidated, plaintiffs argue, these policies will be reversed and the demand for domestic uranium will consequently increase. However, since standing was not challenged in the district court, the record fails to explain how the UESC would decrease demand for domestic uranium and thereby cause plaintiffs harm. Plaintiffs' claim that we may look beyond the record to the circumstances surrounding the case is inaccurate. The Supreme Court has specifically stated that "[t]he existence of a justiciable 'case' or 'controversy' under Art. III must affirmatively appear in the record." Bender, 106 S.Ct. at 1334.
 
 
 35
 Notwithstanding DOE's failure to challenge plaintiffs' standing at the trial level, it did specifically refute plaintiffs' claim that the UESC harmed them because it decreased demand for domestic uranium. The DOE claimed in that forum that the UESC did not amend existing DOE policy and, thus, could not change the demand for domestic uranium. On this appeal, the DOE renews this contention by arguing that even though the demand for domestic uranium has declined and will likely continue to decline, the adoption of the UESC did not affect that demand and, consequently, plaintiffs do not have standing to challenge the UESC. It maintains that the policies behind the UESC existed prior to its adoption and would continue to exist even if the UESC were declared null and void.
 
 
 36
 Plaintiffs conceded in their complaint that the DOE did not restrict enrichment of foreign uranium and allowed customers to select a variable-tail assay before the adoption of the UESC. See Complaint, record, vol. 1, doc. 1 at 9, 17, 18. An injury that "occurred before, existed at the time of, and continued unchanged after the challenged" action cannot support a standing claim. California Ass'n of the Physically Handicapped, Inc. v. FCC, 778 F.2d 823, 827 (D.C.Cir.1985). Policies ostensibly harming plaintiffs that existed prior to the adoption of the UESC are insufficient to vest plaintiffs with standing to challenge the legality of the UESC. However, the record in this case is unclear as to whether adoption of the UESC did in fact effect a change in DOE policies regarding enrichment of foreign uranium and availability of variable-tail assays. The UESC may have implemented more lenient policies that exacerbated the economic harm already experienced by plaintiffs. This unresolved factual dispute surrounding the causation component of the standing inquiry may not be resolved on appeal.
 
 
 37
 Plaintiffs argue alternatively that UESC pricing of DOE enrichment services may decrease demand for domestic uranium, thus harming them and supporting standing to challenge the UESC. Plaintiffs cannot argue that lower enrichment prices decrease domestic uranium sales. If the DOE has higher prices, DOE customers are encouraged to seek enrichment services from DOE's foreign competitors. Both parties agree that entities who use foreign enrichers also tend to purchase foreign uranium. Consequently, a decrease in DOE enrichment prices should encourage domestic enrichment and, concomitantly, domestic uranium purchases. On the other hand, plaintiffs may be arguing that new pricing techniques favor foreign uranium over domestic uranium and, thus, decrease demand for domestic uranium. We find this doubtful because section 2201(v) specifically mandates that pricing of enrichment services be nondiscriminatory. Nonetheless, plaintiffs should be permitted to present whatever factual support they have for this argument on remand.
 
 
 38
 Because of the unresolved factual dispute surrounding the causation component of the standing inquiry, we cannot conclude that plaintiffs have satisfied their burden on appeal of establishing standing. However, because the DOE failed to contest standing in the district court, plaintiffs should be allowed to present evidence supporting their standing allegations. "Factual issues concerning the existence of the standing requirements in a particular case are to be resolved in the same manner as any other controverted fact." Steele, 755 F.2d at 1414. Thus, we remand for resolution of the factual dispute which will be determinative of plaintiffs' standing to challenge the UESC.
 
 C. Merits
 
 39
 Because the issue of standing on this claim remains unresolved, any opinion on the merits of this case would be an advisory opinion. "[F]ederal courts established pursuant to Article III of the Constitution do not render advisory opinions." United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). Thus, we cannot reach the merits of plaintiffs' challenge to the UESC.
 
 
 40
 III. Restrictions on Enrichment of Foreign Uranium
 
 
 41
 Count one of plaintiffs' complaint alleges that the DOE violated 42 U.S.C. Sec. 2201(v) (1982) when it refused to restrict enrichment of foreign uranium despite a determination that the domestic uranium industry was not viable. The DOE argues that restrictions are only required if they would make the domestic uranium industry viable and that restrictions at this time would not result in a viable industry. The district court interpreted section 2201(v) to require the DOE to restrict enrichment of foreign uranium whenever the domestic industry is not viable--whether or not such restriction would result in successful resuscitation of the uranium industry. The DOE appealed and moved to stay enforcement of the district court order until the appeal was finally decided. We granted the motion to stay and expedited the appeal.
 
 
 42
 This case is one of statutory interpretation. The parties agree that the domestic uranium industry is not viable and agree that the DOE's actions are controlled by section 2201(v). However, they disagree on the meaning of that statute. Even under current law, which requires great deference to agency interpretation of statutes, the Supreme Court has recognized that
 
 
 43
 [t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.
 
 
 44
 Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984) (citations omitted). Under this authority, the district court decided that, unless the DOE determines that something other than restrictions will assure the viability of the domestic uranium industry, section 2201(v) requires restrictions on enrichment of foreign uranium whenever the domestic industry is not viable. Since this is a statutory interpretation question, we review that decision de novo. See Supre v. Ricketts, 792 F.2d 958, 961 (10th Cir.1986); City of Edmonds v. United States Dep't of Labor, 749 F.2d 1419, 1421 n. 2 (9th Cir.1984).
 
 
 45
 The courts have long recognized that "the starting point for interpreting a statute is the language of the statute itself." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); see also Rubin v. United States, 449 U.S. 424, 429, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). "When we find the terms of a statute unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances." ' " Id. at 430, 101 S.Ct. at 701 (quoting TVA v. Hill, 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978) (quoting Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930)). Even when an agency interpretation is normally entitled to deference, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., 467 U.S. at 842-43, 104 S.Ct. at 2781. Thus, we look first to the language of the statute, and if it is unambiguous, we look to the legislative history only to determine if exceptional circumstances dictate an interpretation contrary to the language of the statute.
 
 
 46
 As noted, the relevant portion of the statute provides that "to the extent necessary to assure the maintenance of a viable domestic uranium industry, [the DOE] shall not offer " enrichment services for foreign-source uranium designated for use in the United States. 42 U.S.C. Sec. 2201(v) (emphasis added). The DOE relies on Young v. Community Nutrition Institute, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986), in arguing that the phrase "to the extent necessary" gives it discretion to determine whether to restrict enrichment of foreign uranium. The Supreme Court in Young was interpreting 21 U.S.C. Sec. 346 (1982), which states:
 
 
 47
 Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice shall be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a) of this title; but when such substance is so required or cannot be avoided, the Secretary shall promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health, and any quantity exceeding the limits so fixed shall also be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a) of this title.
 
 
 48
 (Emphasis added.) The FDA's longstanding interpretation was that the phrase "to such extent as he finds necessary for the protection of public health" modified the word "shall." Thus, the FDA was of the opinion that it was to determine when regulation was necessary to protect public health. Having determined that regulating aflatoxin (a poisonous substance present in some foods) was not necessary to protect the public health, the FDA did not promulgate regulations. The Supreme Court decided that it was unclear whether the critical phrase modified "shall" or "the quantity therein or thereon." As a result, the Supreme Court concluded that the courts should adopt the agency interpretation of the statute as a reasonable one. The critical point in the analysis was that the "FDA [had] advanced an interpretation of an ambiguous statutory provision." Young, 106 S.Ct. 2365. Once that point was reached, the Court was required to defer to the reasonable interpretation of the agency.
 
 
 49
 The case before us presents a different situation. Congress, in enacting section 2201(v), used unambiguous language. It stated "the [DOE] ... shall not offer" the enrichment of foreign uranium. The use of "shall" is usually mandatory language and will require action unless a convincing argument to the contrary can be made. See City of Edmonds, 749 F.2d at 1421; American Fed'n of Gov't Employees v. Federal Labor Relations Auth., 739 F.2d 87, 89 (2d Cir.1984); Manatee County v. Train, 583 F.2d 179, 182 (5th Cir.1978); Association of Am. R.R. v. Costle, 562 F.2d 1310, 1312 (D.C.Cir.1977). Thus, section 2201(v) requires that the DOE not offer enrichment of foreign uranium.
 
 
 50
 This requirement is, of course, subject to the modifying phrase "to the extent necessary to assure the maintenance of a viable domestic uranium industry." That phrase, however, is also unambiguous. It informs the DOE of the amount of restriction required; it does not provide a scenario in which the DOE is excused from restricting foreign enrichment notwithstanding a nonviable domestic industry. It instructs that when domestic nonviability is determined, restrictions on enrichment of foreign-source uranium must be imposed and must become increasingly aggressive, to the point of 100% restriction, until the domestic industry is rejuvenated and becomes viable. If a less-than-100% restriction can assure viability, only that lesser level of restriction is required. The statute does not provide that increasingly stiffer restrictions are required only to the point that DOE determines that such restrictions will not resuscitate the industry. Under its interpretation of the statute, the DOE has no discretion until that time, but once such a determination is made, it may lift all restrictions--at the precise point in time when the domestic industry is at its lowest ebb.
 
 
 51
 Furthermore, the nature of the modifying phrase here differs from Young. In Young, the FDA specifically argued that regulations were not required to protect the public health; rather, tolerance levels established by the FDA accomplished that goal. The FDA credibly argued that it could serve the statutory purpose--the protection of the public health--without publishing regulations for aflatoxin. In this case, the DOE cannot accomplish its statutory purpose--the maintenance of a viable domestic uranium industry--without imposing restrictions on enrichment of foreign uranium. Rather, the DOE proposes to abandon the statutory goal. The DOE does not argue that the domestic industry is viable without restrictions; it claims that it has discretion to determine whether to implement restrictions when restrictions will not assure the viability of the domestic industry. The DOE's interpretation strains the plain meaning of section 2201(v). The unambiguous language of the statute requires the DOE to refuse enrichment of foreign uranium "to the extent necessary to assure" a viable domestic industry. The DOE may determine how much restriction is required to assure viability, but it cannot decide not to impose restrictions when the industry is not viable. It must continue to increase restrictions until the domestic industry becomes viable. The DOE's argument that this policy is not wise in the present uranium market should be made to Congress and not to the courts. We can only apply the statute as Congress passed it.
 
 
 52
 Finally, this is not a "rare and exceptional" case in which the language of the statute must give way to clear congressional intent. In hearings prior to the enactment of section 2201(v), consistent concern was expressed over the effects of imports on the domestic uranium industry. See, e.g., Private Ownership of Special Nuclear Materials: Hearings Before the Subcomm. on Legislation of the Joint Comm. on Atomic Energy, 88th Cong., 1st Sess. 114-15 (1963) (Statement of Richard D. Bokum II, President, United Nuclear Corp.); id. at 145 (statement of Andrew J. Biemiller, Director, Department of Legislation, AFL-CIO); Private Ownership of Special Nuclear Materials, 1964: Hearings Before the Subcomm. on Legislation of the Joint Comm. on Atomic Energy, 88th Cong., 2d Sess. 154 (1964) (statement of Dean A. McGee, President, Kerr-McGee Oil Industries). In its report to Congress, the Joint Committee first recognized the importance of a viable domestic uranium industry:
 
 
 53
 The maintenance of a viable domestic uranium mining and milling industry is an essential part of a sound nuclear industry and is also vital to the long-range defense and security interests of the United States. The bill accompanying this report, by providing for uranium enrichment services, is a desirable step in this direction.
 
 
 54
 S.Rep. No. 1325, 88th Cong., 2d Sess., reprinted in 1964 U.S. Code Cong. & Admin.News 3105, 3115. The committee then explained the basis for requiring restrictions.
 
 
 55
 [I]mportation could have a serious impact on the uranium mining and milling industry, particularly during a period of limited demand for its product. Accordingly, the flexible restrictions contained in the committee bill will allow the [DOE] to review periodically the condition of the domestic and world uranium markets and to offer enrichment services on a basis which will assure, in its opinion, the maintenance of a viable domestic uranium mining and milling industry.
 
 
 56
 ....
 
 
 57
 ... [T]he committee ... has concluded that it would be reasonable to place restrictions upon the performance of services by the [DOE] where the enrichment of foreign material would have an adverse effect on the domestic uranium industry. It is the committee's view that the measures taken in this bill to assure the viability of the domestic uranium industry are in the national interest since this industry is closely related to our vital defense and security interests.
 
 
 58
 Id., reprinted in, 1964 U.S.Code Cong. & Admin.News at 3120-21. At no point in the legislative history is there any indication that Congress would permit the DOE to abandon attempts to maintain a healthy domestic industry. On the contrary, Congress considered a viable domestic industry to be vitally important to United States defense and security interests and did not want the United States to become dependent on foreign sources of uranium. We conclude that the legislative history supports our determination that if the domestic uranium industry is not viable, the DOE must restrict enrichment of foreign uranium. Thus, we affirm the district court's decision granting plaintiffs' summary judgment motion on count one.
 
 IV. Conclusion
 
 59
 Plaintiffs' challenge to the UESC is remanded to the district court. The record does not clearly demonstrate that plaintiffs have standing. However, the DOE did not challenge standing in the district court, and plaintiffs should be given an opportunity to prove their standing allegations.
 
 
 60
 Plaintiffs' claim that section 2201(v) unambiguously requires the DOE to implement restrictions on enrichment of foreign uranium when the domestic uranium industry is not viable is correct. The DOE has not implemented such restrictions and, thus, the district court's decision granting plaintiff injunctive relief was appropriate and should be affirmed.
 
 
 61
 The case is affirmed in part and remanded in part, with instructions to proceed in a manner consistent with this opinion. The stay of the district court's injunction heretofore entered is dissolved.
 
 
 
 [1]
 Plaintiffs bear the burden of proving standing. This "burden is not insurmountable; they need only demonstrate a 'substantial likelihood' that the causal link exists," Munoz-Mendoza v. Pierce, 711 F.2d 421, 427 (1st Cir.1983), and "that the relief requested will redress the injury." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978)