907 F.2d 1138
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
KANSAS GAS & ELECTRIC COMPANY; Kansas City Power & Light
Company; Kansas Electric Power Cooperative, Inc.;
Wolf Creek Nuclear Operating
Corporation, Plaintiffs-Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION; Chevron, U.S.A., Inc.;
Chevron Resources Company (successors in interest
to Westinghouse Electric Corporation),
Defendants-Appellees.
 No. 89-1738.
 United States Court of Appeals, Fourth Circuit.
 Argued April 2, 1990.
Decided June 6, 1990.
Rehearing Denied July 10, 1990.
Rehearing and Rehearing In Banc Denied Aug. 15, 1990.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., Senior District Judge. (CA-75-683-R)
 Virginia W. Powell, Hunton & Williams, Richmond, Va. (Argued), for appellants; James M. Rinaca, Laura H. Hamilton, Hunton & Williams, Richmond, Va., on brief. James Norton Roethe, Pillsbury, Madison & Sutro, San Francisco, Cal. (Argued), for appellees; Walter R. Allan, David W. Trotter, Pillsbury, Madison & Sutro, San Francisco, Cal., James C. Roberts, Bradfute W. Davenport, Jr., George A. Somerville, Mays & Valentine, Richmond, Va., on brief.
 E.D.Va.
 REVERSED AND REMANDED.
 Before DONALD RUSSELL, PHILLIPS and CHAPMAN, Circuit Judges.
 PHILLIPS, Circuit Judge:
 
 
 1
 Kansas Gas & Electric Company, Kansas City Power & Light Company, Kansas Electric Power Cooperative, Inc., and Wolf Creek Nuclear Operating Corporation (collectively "KGE") appeal the district court's grant of summary judgment for Westinghouse Electric Corporation, Chevron U.S.A., Inc., and Chevron Resources Company (collectively "Chevron") in this dispute over the meaning of a contractual price term for the sale of uranium. On cross motions for summary judgment, the district court ruled that the plain meaning of a contractual price term that keyed price to "Exchange Value," as established by the Nuclear Exchange Corporation (NUEXCO), embraced a separate "Premium" NUEXCO listed for certain sales of domestic uranium. KGE appeals, contending that the district court erred in that it either misinterpreted the contract as a matter of law or impermissibly resolved disputed issues of material fact. Because we agree with KGE that the plain meaning of "Exchange Value" did not include the separate "Premium," we reverse the grant of summary judgment for Chevron and remand with directions to enter judgment, as prayed, for KGE.
 
 
 2
 * In February 1980, Kansas Gas & Electric (Kansas Gas) and Kansas City Power & Light Company (KCPL) ended years of litigation with Westinghouse Corporation by entering into a settlement agreement, as part of which Kansas Gas and KCPL undertook to purchase uranium from Westinghouse. The contract for the purchase of uranium (the Uranium Contract) was attached as an exhibit to the settlement approved by the federal district court. In January 1981, Gulf Oil Corporation agreed, as part of a settlement with Westinghouse, to accept assignment of Westinghouse's rights, interests, and obligations under the Uranium Contract. In July 1985, Gulf merged with Chevron U.S.A., Inc., and Chevron U.S.A. assumed Gulf's rights, interests, and obligations under the Uranium Contract, with Chevron Resources Company administering the contract as agent. Kansas Gas and KCPL assigned partial interest in the Uranium Contract to Kansas Electric Power Cooperative, Inc., and all three of those entities delegated responsibility for administering the Uranium Contract to Wolf Creek Nuclear Operating Corporation.
 
 
 3
 Under the Uranium Agreement, Chevron was bound to supply KGE from 1985 to 1988 with specified quantities of uranium at a "market minus" price, i.e., a defined Market Price minus a defined discount not relevant here. The agreement defined "Market Price" as the "Exchange Value" published by the Nuclear Exchange Corporation (NUEXCO): "The market price per pound of [uranium] ("Market Price") shall be defined as the Exchange Value published [monthly] by the Nuclear Exchange Corporation (NUEXCO)...." Joint Appendix at 61. NUEXCO intended "Exchange Value" to reflect its "judgment of the price at which transactions for significant quantities of natural uranium concentrates could be concluded as of the date indicated." Joint Appendix at 276.
 
 
 4
 The Uranium Agreement permitted delivery of either foreign or domestic uranium, unless KGE's ability to use foreign uranium became restricted by any governmental authority, in which case Chevron was to deliver domestic uranium. Joint Appendix at 57. On June 20, 1986, Judge Carrigan of the United States District Court for the District of Colorado issued what became known as the "Carrigan Order," ordering the Department of Energy to restrict enrichment of foreign uranium intended for use in United States reactors. This order had the potential to affect KGE's supply of uranium, as uranium had to be "enriched" before it was suitable for use in a reactor, and the Department of Energy was the principal supplier of enrichment services to United States utilities, including KGE. Therefore, five days after the issuance of the Carrigan order, KGE sent Chevron a letter reminding it of its obligations under the agreement and requesting delivery of domestic uranium only:
 
 
 5
 Therefore, until the court's restrictions on the enrichment of and consequently our use of uranium of foreign origin are removed, we must require that Chevron deliver material of domestic origin only. At such time as the DOE is again free to enrich uranium of foreign origin and such can be accommodated in our delivery schedule, we would be willing to discuss deliveries of foreign origin material.
 
 
 6
 Joint Appendix at 173. Chevron responded on June 30 that it did not believe that the Carrigan Order restricted KGE's use of foreign uranium under the agreement, but it nonetheless agreed to deliver only domestic uranium, as requested. Joint Appendix at 174. The United States Court of Appeals for the Tenth Circuit stayed the Carrigan Order in July 1986, pending appeal.[1] In a letter written in September, after the Tenth Circuit had stayed the district court order, Chevron reiterated its position that it would be permitted under the contract to deliver foreign uranium, but stated that it would nonetheless continue to deliver only domestic uranium. Joint Appendix at 594.
 
 
 7
 In any event, the uncertainty created by the Carrigan Order had the effect of increasing the price for domestic uranium in some transactions where the buyer specifically demanded only domestic origin uranium. Accordingly, beginning in December 1986, NUEXCO began publishing a separate "Premium" to reflect an incremental added price, over Exchange Value, that some buyers were willing to pay to receive only domestic uranium. Since the issuance of the Carrigan Order, Chevron had continued to deliver only domestic uranium, and in early 1987 the parties sought clarification from NUEXCO of the significance of the Premium in relation to Exchange Value. NUEXCO responded:
 
 
 8
 Since November 30, 1986, NUEXCO has recognized a premium in relation to the Exchange Value for transactions in which the buyer restricts the acceptable origin to U.S. Thus, for transactions in which the buyer restricts the acceptable origin to U.S., the price analogous to the Exchange Value would be determined by adding the Exchange Value and the U.S. premium.
 
 
 9
 Joint Appendix at 532. In light of the publication of the Premium, Chevron insisted that KGE pay a price equal to the Exchange Value plus the Premium, less the contractual discount. The parties met in May 1987 to discuss Chevron's proposed price increase, but negotiations failed. KGE maintained that under the contract the prediscount price was Exchange Value without the Premium. Nonetheless, KGE did not unequivocally instruct Chevron that it could deliver either foreign or domestic uranium while the stay of the Carrigan Order was in effect. At the same time, Chevron continued to deliver domestic uranium only, despite uncertainty whether it would ultimately be able to recover a premium price. In short, from all appearances, Chevron willingly delivered the domestic uranium, thinking it would recover the premium price, and KGE willingly accepted it, thinking it would pay only the Exchange Value less the discount.
 
 
 10
 Having reached this impasse, Chevron moved in federal district court to compel arbitration of the price dispute under a contractual arbitration provision. The district denied the motion, and we affirmed. See Kansas Gas & Electric Co. v. Westinghouse Electric Co., 861 F.2d 420 (4th Cir.1988). We held that because NUEXCO had never ceased publishing the Exchange Value, the contract term permitting arbitration if the Exchange Value was "not published for two (2) consecutive months" was not satisfied. We rejected Chevron's argument that the publication of the Premium made "the Exchange Value ... no longer the Exchange Value." Id. at 423. KGE then moved in the district court to compel Chevron's compliance with the price term of the contract. Chevron counterclaimed, asserting in alternative breach of contract claims that KGE had not paid the price owed under the contract or that the contract's pricing mechanism had failed of its essential purpose, so that a reasonable price was owed under U.C.C. Sec. 2-305. On cross motions for summary judgment, the district court held for Chevron, reasoning as follows:
 
 
 11
 The Court finds that the terms of uranium contract are clear. The price to [be] paid was the "Exchange Value" published by NUEXCO (less specified amounts that are not in dispute). The Court holds that the "Exchange Value" published by NUEXCO for domestic uranium concentrates included the so-called premium. It is that simple. NUEXCO itself defines the Exchange Value as its "judgment of the price at which transactions for significant quantities of natural uranium concentrates could be concluded...." In NUEXCO's judgment, beginning in December 1986, the price at which transactions for significant quantities of domestic uranium could be concluded included a premium. To accept plaintiffs' argument in this case is to split a legal hair.
 
 
 12
 Kansas Gas & Electric Co. v. Westinghouse Electric Company, CA-75-683-R, slip op. at 3 (E.D.Va. Apr. 14, 1989); Joint Appendix at 604 (emphasis in original).[2] KGE now appeals.
 
 II
 
 13
 KGE contends that the district court should have granted summary judgment in its favor because the clear meaning of the unambiguous term Exchange Value did not embrace the separate Premium. The contract provided that "[t]he market price per pound of [uranium] ("Market Price") shall be defined as the Exchange Value published [monthly] by the Nuclear Exchange Corporation (NUEXCO)...." KGE asserts that Exchange Value was a contractually designated surrogate for market price and that the district court's interpretation of that clear term as meaning Exchange Value plus the Premium amounted to a rewriting of the contract. Chevron, on the other hand, argues that the NUEXCO Exchange Value was intended to, and originally did, reflect the spot market price of uranium. Therefore, Chevron maintains, the district court properly gave effect to the parties' actual intention to tie the contract price to the spot market price by including in Exchange Value the Premium for sale of domestic uranium.
 
 
 14
 We agree with the district court that Exchange Value has a clear, unambiguous meaning, but we hold that the court erred in ruling that Exchange Value really meant "Exchange Value-plus," i.e., that it included the Premium. The contract provides explicitly that "Market Price" would be the NUEXCO Exchange Value--neither the language nor the context of the "Market Price" definition supports the notion that in certain circumstances external factors, such as a separately published premium, might warrant adjustment of Market Price under the contract. The parties could have provided contractually for the contingency that at some point during performance Exchange Value might not serve as a fair indicator of the spot market price of uranium, but chose not to do so. They could have, for example, included a price reopener provision of the sort used in an otherwise similar uranium purchase agreement between Chevron and South Carolina Electric & Gas Company. That agreement provided that the parties would enter into good faith price renegotiations if "either party reasonably believe[d] that the Exchange Value [did] not fairly represent the market price per pound of [uranium]." See Exhibit 4 to Deposition of Wesley Miller. A literal interpretation of the agreement in this case evinces a contractual intent that each party would bear the risk that Exchange Value might not fairly represent spot market price.
 
 
 15
 Were the term Exchange Value ambiguous, Chevron could conceivably have proven, by resort to extrinsic evidence, what it asserts here--that contractual designation of the NUEXCO Exchange Value as Market Price reflected no more than the parties' intent to equate Market Price with the actual spot market price for domestic uranium. In response, KGE might have been able to adduce evidence supporting its contention that the parties' intent was for the NUEXCO Exchange Value to serve as a readily determinable, bright-line surrogate for the actual spot market price, with both parties bearing some risk that for particular transactions the Exchange Value might deviate from spot market price. We agree with the district court, however, that consideration of such extrinsic evidence is inappropriate to construe this unambiguous term, see Martin v. Edwards, 548 P.2d 779 (Kan.1976) (extrinsic evidence of intent inadmissible to construe unambiguous contract term), but we think that when all such evidence is screened from view, the plain meaning of Exchange Value is Exchange Value only, without the added Premium.[3]
 
 
 16
 Our analysis of the clear term Exchange Value renders immaterial the parties' dispute as to whether in fact the Exchange Value ceased to reflect the spot market price for the domestic uranium once the Premium was published. KGE notes that during the relevant period domestic uranium was sold at Exchange Value price, i.e., without the Premium, in transactions with foreign purchasers who were not subject to the restraints that the Carrigan Order would have imposed had it not been stayed. Furthermore, the Premium at most purported to indicate the increased price for transactions in which the buyer specifically demanded domestic origin uranium; it did not by its terms apply to all sales of domestic uranium. This factual dispute is immaterial, however, in light of our holding that Exchange Value has a clear meaning that does not invite an inquiry into actual spot market value.
 
 
 17
 Consequently, it is also immaterial whether KGE by its communications to Chevron and its actions effectively restricted the source of the uranium to domestic only. Chevron maintains--as it must in order to uphold the district court's grant of summary judgment--that there is no genuine issue of fact on this question in light of, among other things, KGE's June 25, 1986, letter demanding that Chevron deliver only domestic uranium. KGE, on the other hand, maintains that this issue is genuinely in dispute. It notes that its June 25 letter to Chevron expired by its own terms when the stay of the Carrigan Order lifted governmental restrictions on enrichment of foreign uranium. It also cites evidence tending to show that Chevron continued to deliver domestic uranium voluntarily even as it maintained that the agreement would have permitted, the Carrigan Order notwithstanding, delivery of foreign uranium. It is questionable whether this record would warrant holding as a matter of law that KGE actually restricted the uranium's origin, but that fact would in any event be immaterial. It would matter only if we had first concluded that Exchange Value encompassed the Premium, necessitating further inquiry into whether on these facts Chevron would be entitled to recover the Premium.
 
 III
 
 18
 For the foregoing reasons, the judgment of the district court is reversed and the case remanded for entry of judgment, as prayed, for KGE.
 
 
 19
 SO ORDERED.
 
 
 
 [1]
 In July 1987, the Tenth Circuit affirmed the district court on the merits and vacated the stay. Western Nuclear, Inc. v. Huffman, 825 F.2d 1430 (10th Cir.1987). In October 1987, the stay was reinstated after the Supreme Court granted certiorari. In June 1988, the Supreme Court reversed the Tenth Circuit and remanded the case to the district court, Huffman v. Western Nuclear, Inc., 108 S.Ct. 2087 (1988), where it was finally dismissed in February 1989
 
 
 [2]
 The district court has now, however, apparently reversed its view of the precise issue presented in this case. In a November 16, 1989, opinion, the court construed an agreement between Chevron and Consolidated Edison of New York that was identical in all material respects to the Chevron/KGE agreement. The court held: "Contrary to its finding in [KGE v. Westinghouse ], this Court concludes that the U.S. Premium should not be added to NUEXCO's Exchange Value to reach a new price for the uranium contract." Consolidated Edison Company of New York v. Westinghouse Electric Company, CA-75-674-R, slip op. at 3 (E.D.Va. Nov. 16, 1989). In a footnote, the court explained that documents had come to light after the KGE case showing that NUEXCO never intended the Premium to be included in Exchange Value and, moreover, that Chevron had influenced NUEXCO to publish the Premium and had even tried, unsuccessfully, to convince NUEXCO to increase Exchange Value by the Premium amount. Despite the reference to this evidence, the court found, as it had in its prior case, that the price term was clear and unambiguous, but nonetheless reached the opposite conclusion as to its meaning--that the Exchange Value did not include the Premium. Id
 
 
 [3]
 All agree that Kansas law applies. Chevron agrees that Exchange Value has an unambiguous meaning, and that therefore consideration of extrinsic evidence of intent would be improper. They contend, however, that we could under U.C.C. Sec. 2-202 consider extrinsic "usage of trade" evidence that "Exchange Value" meant the spot market price. There is no need to do so here. Exchange Value clearly referred to the particular listing in the NUEXCO monthly report and did not have any specialized, contextual meaning that would require elucidation from trade usage evidence. See Branner v. Crooks, 635 P.2d 1265 (Kan.Ct.App.1981)